THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.*
LUCIANO ZENÓN RODRÍGUEZ, k/a JULIO ZENÓN RODRÍ-
GUEZ, Defendant and Appellant.

No. CR-64-260.        Decided December 7, 1964.

*Miguel E. Herrero Frank* for appellant. *J. B. Fernández Ba-
dillo, Solicitor General,* and *J. F. Rodríguez Rivera* for The
People.

Division composed of Mr. Justice Pérez Pimentel, as Chief
Judge of Division, Mr. Justice Rigau, and Mr. Justice
Dávila.

PER CURIAM: By judgment of September 18, 1964, we
held that the evidence believed by the trial court was suffi-
cient to sustain appellant's conviction, and, consequently, we
affirmed the judgment sentencing him to serve 10 days in
jail and suspending his driver's license for one year for oper-
ating a motor vehicle under the influence of intoxicating
liquor.

A further detailed analysis of the entire evidence con-
vinces us that the same did not establish defendant's guilt
beyond a reasonable doubt. The prosecution evidence con-
sisted of the testimony of policeman Guillermo Ramos and
of Modesto Canales.

The policeman testified that on June 2, 1963, the police station received word that defendant Luciano Zenón Rodríguez had sustained an accident with his automobile. He went to the scene of the occurrence on highway 993, where he found defendant's automobile in the left-hand side of the road, crashed into a tree; that about 15 minutes later he saw the defendant in the hospital. He further testified:

"Q. What did he tell you, if he told you anything?

A. Well, he, I questioned him on the accident. Then, when I spoke with him, he smelled strongly of liquor. I then suggested to have a blood sample taken; he said no. Sometimes he said yes and others he said no. Then I suggested the urine test and he said no. Then I explained to him the consequences, what he would have to do then, and he said it was all right. Then I took him.

Q. Did you ask him about the automobile?

A. I said . . . he did not tell me that he had crashed into anything; I only asked him how it happened and he said that he crashed and that he and the other one had been injured.

Q. That he crashed and that he and the other one had been injured?

A. He and Modesto Canales.

Q. Did he say who was driving the vehicle?

A. Well, he told me that he was the one who was driving the vehicle, that the vehicle is his.

Q. Did you see him walking?

A. In the hospital I talked with him, right?

Q. Was he standing?

A. Yes, sir.

Q. Tell me, did he behave like a normal person at that moment?

A. Well, I don't know whether he was normal; in my presence he was normal; only his eyes looked red.

Q. Did he stagger?

A. No, when I arrived he was standing also; I spoke with him what I had to; that's all.

Q. Then, this statement which you gave here, you gave it before the District Judge of Vieques?

A. Yes, sir.

Q. Tell me, witness, are you sure he did not stagger?

A. Well, he, while I was there, when I arrived he was walking around . . . that is, very nervous. Then I called him and spoke with him.

Q. But did he stagger or not?

DEFENSE: Objection, Your Honor, the witness already said that he did not.

THE COURT: Proceed.

A. Well, you could see that he was badly hurt, I don't know whether as a result of the blows.

DISTRICT ATTORNEY: The question is whether he staggered or not.

A. Yes, sir.

Q. He did stagger?

A. Yes, sir." (Tr. Ev. 5–6.)

On cross-examination he testified that defendant had a blow and was bleeding. He answered to the defense:

"DEFENSE: The fact is that he was bleeding profusely?

A. Yes, I could see that he was injured and that he was bleeding."

He further testified that defendant told him that he was driving his own car.

The other witness, Modesto Canales, testified that the day of the occurrence he was together with defendant. Upon questioning by the district attorney he testified as follows:

"Q. Where did you get in the car with him?

A. In front of my house.

Q. In front of your house. Witness, in what condition, if you know, was he when you got in the car?

A. Well, he was all right.

Q. Was he all right?

A. That's right, he looked all right to me.

Q. And after you got in, did he always look all right?

A. No, on the way back he was not as he used to be; he did not look all right to me.

THE COURT: On the way back, did you not see him?

DISTRICT ATTORNEY: He did not look all right to you?

A. He didn't look as he did at first.

Q. And how was he?

A. Well, on the way back, I said that he was drunk because he was driving quite fast.

Q. He was?

A. Quite fast and he never speeds, you see?

Q. He never speeds?

A. He never sped like that, and I said 'ah! he must be drunk.'

Q. Did you give a statement somewhere?

A. Yes, sir.

Q. Before the District Judge?

A. Before the Judge of Vieques.

Q. Tell me, and did anything happen when you were coming in the car?

A. Well, it crashed.

Q. Into what did it crash?

A. Into a tree.

Q. Was that tree in the center of the road?

A. To one side.

Q. In the middle of the road or on the edge of the road?

A. Outside of the road, on the edge.

Q. That's all with the witness. Who was driving the car when the accident occurred?

A. He was.

Q. Who is he?

A. Zenón.

Q. That's all." (Tr. Ev. 9–11.)

On cross-examination he testified that the accident occurred when defendant applied the brakes and lost control. He further testified:

"DEFENSE: You testified that he had not been drinking?

A. Eh?

Q. Here, upon questioning by the district attorney, you testified that he had not been drinking?

DISTRICT ATTORNEY: He did not say that; on the contrary, he testified that he had seen him drunk.

THE COURT: He has not said that.

DEFENSE: What then did you testify, Modesto, that when you got in the car he was all right?

A. Yes, sir.

Q. While on the road, what happened?

A. On the way back I noticed that he was tight.

Q. That he was drinking?

THE COURT: That he was tight.

DEFENSE: Did you see him drinking?

A. Well, I had two shots with him.

Q. And how many did he have?

A. One and one.

Q. How come, then, that during all the time you were with Luciano you had two shots?

A. Yes, sir.

Q. That was all. Then the accident occurred after you had two shots.

A. That's all, Your Honor.

DISTRICT ATTORNEY: That's what you had with him. How long were you with him in the car, from the time you left your house?

A. Well, more or less two hours.

Q. About two hours, and where did you go?

A. Well, we went, we took a ride through Puerto Real and went to La Esperanza; in La Esperanza we had the two drinks." (Tr. Ev. 12–13.)

Defendant testified. He explained the occurrence as follows:

"Q. Please explain to the Judge what happened on June 2, 1963 with the automobile which you were operating.

A. That day I was travelling from south to north as we drew near the town of Vieques, that is, from the ward of Esperanza, and as I came to a curve I applied the brakes, a tire blew out and the front left part collided.

Q. Tell me, Luciano, did you receive any blow, any impact as a result of the accident?

A. I sustained a fracture of the nasal bone.

Q. Did you bleed as a result of the fracture of the nasal bone?

A. I had a hemorrhage which lasted approximately 20 or 30 minutes.

Q. Luciano, had you imbibed alcoholic drinks that day?

A. I had taken two small beers and I paid two drinks for this young man also. That was all.

Q. That was all you had?

A. Yes, sir.

Q. That's all." (Tr. Ev. 13–14.)

On cross-examination he testified that he refused to have a blood sample taken because of the condition in which he was as a result of the injuries received, and that he did not recall the policeman saying anything about a urine sample.

If we examine closely the testimony of policeman Guillermo Ramos, we see that the only incriminating evidence against defendant was the fact that his breath smelled strongly of liquor.[1] It is true that this witness testified that defendant staggered and that his eyes were red, but as to the staggering he also said that in his presence defendant was normal and that he did not know whether he staggered as a result of the blows received. It is probable, although there is no evidence thereon, that the red color of his eyes was due also to the strong blow received on the nose, or to any other cause not necessarily a drunken condition.

The other witness, Canales, asserted that when he got in the car with defendant, the latter was all right, but that "on the way back, he was not as he used to be, he did not look all right to me . . . he didn't look as he did at first . . . well, on the way back, I said he was drunk because he was driving quite fast . . . he never sped like that, and I said, ah! he must be drunk . . . on the way back I noticed that he was tight."

Yet, the evidence establishes that this witness was together with defendant, from the time he got in the car

---

[1] The presence of an alcoholic breath is not sufficient by itself to sustain that he committed the offense charged. *People* v. *Zalduondo Fontánez*, 89 P.R.R. 63 (1963).

until the accident occurred, for about two hours. During those two hours defendant only had two shots, according to Canales' testimony, or two beers, according to defendant's testimony.[2]

That evidence—defendant's breath smelled of liquor and during two hours he had "two shots"—was the most substantial on defendant's drunken condition which the trial court had under consideration.

It could be argued that there is still more because Canales testified that defendant was drunk or "tight," but from an examination of the entire testimony of that witness it will be seen that his conclusion on defendant's drunken condition is not warranted by the facts. The witness naively says how he arrived at his conclusion. Since defendant was travelling quite fast and he never sped like that, "I said, ah! he must be drunk." There is nothing in the record to show that Canales travelled frequently or continuously in defendant's car. There is no basis to believe that Canales knew that defendant always drove his car slowly. Hence, the fact that the day of the accident defendant was travelling fast cannot sustain that he had never before travelled fast, and, consequently, that the speed was an infallible indicium of defendant's drunken condition. Canales reached that conclusion mostly on the basis of that indicium, and the trial court accepted that conclusion without making its own. On the other hand, Canales confirmed defendant's theory to the effect that the accident was due to the blowout of one of the tires of his automobile. Canales testified as defendant

---

[2] In the absence of evidence we presume that the "shots" to which Canales refers are the regular "one-ounce" shots.

It is estimated by medical science that in order that the result of the blood test of the average individual be brought up to 0.05 percent of one percent of alcohol, by weight, he must have consumed two ounces of 100-proof whiskey. See Richardson, "Modern Scientific Evidence" 350, § 132. This makes much less creditable Canales' assertion on defendant-appellant's drunken condition, as well as the conclusion reached by the trial court.

520

himself admitted, that the latter lost control of the vehicle and as a result he crashed into a tree. Defendant explained the cause of the loss of control. The policeman who examined the automobile after the accident was in the court during the trial; so was Canales. We presume that if defendant's testimony to the effect that he lost control of the vehicle as a result of the blowout of a tire was not true, the district attorney would have refuted that fact with the policeman or with Canales.

In fact, the evidence in this case does not establish defendant's guilt beyond a reasonable doubt. Such evidence gives rise to that doubt and the same should be resolved in his favor, acquitting him.

Our judgment of September 18, 1964 will be set aside, the judgment rendered by the Superior Court will be reversed, and another rendered acquitting defendant-appellant.

